UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| **CINDY MARIE PAGE,**<br>　　Plaintiff,<br><br>v.<br><br>**KILOLO KIJIKAZI,**<br>**Acting Commissioner**<br>**of the Social Security**<br>**Administration,**<br>　　Defendant. | Case No. 4:20-cv-709-CLM |

# MEMORANDUM OPINION

　　Cindy Marie Page seeks disability and disability insurance benefits from the Social Security Administration ("SSA") based on several impairments. The SSA denied Page's application in an opinion written by an Administrative Law Judge ("ALJ"). The SSA Appeals Council then denied Page's request for review.

　　Page argues: (1) that the ALJ failed to give proper weight to the opinion of her treating physician, Dr. H.B. Thompson; (2) that the ALJ erred in evaluating evidence of her daily activities; (3) that the ALJ improperly drew adverse inferences from Page's lack of medical treatment; (4) that the Appeals Council wrongly denied her request for review; and (5) that once the submissions to the Appeals Council are considered, the denial of benefits lacks the support of substantial evidence.

　　As detailed below, neither the ALJ nor the Appeals Council reversibly erred. So the court will **AFFIRM** the SSA's denial of benefits.

## I.   STATEMENT OF THE CASE

### A.   Page's Disability, as told to the ALJ

Page was 43 years old at the time of the ALJ's decision. (R. 37, 182). Page has a 10th grade education and past work experience as an office manager. (R. 53–54).

At the ALJ hearing, Page testified that she cannot work because she has lots of issues with pain and anxiety. (R. 57). Page also said she has issues with crowds, including the chaos of having all 5 of her kids and grandbaby together. (R. 57–59). Besides taking medication for her anxiety, Page also withdraws herself from situations, like crowds, that cause her anxiety. (R. 58–59).

Page also says she suffers from severe back pain that starts in the middle of her back and goes down both arms. (R. 59). Page's arms and hands go to sleep very often. (*Id.*). And her back pain usually "starts out as like a nag and then it ends up being like sharp-shooting pain." (*Id.*). But Page's pain medication helps control her back pain and reduces her pain down to a 1 on the pain scale. (*Id.*) And Page suffers from fibromyalgia, which she says causes her to hurt all over and some days makes it where she cannot get out of bed. (R. 62).

Page can walk a couple of blocks but then needs to sit and rest for a minute. (R. 63). As far as lifting and carrying, Page says that she can lift 8 or 10 pounds of groceries comfortably but struggles with heavier items. (*Id.*). Page's kids help her with household chores, but she tries to do her own grocery shopping. (R. 64–65). Page eats out at fast food places, like McDonald's or Arby's, but she cannot handle the crowds at sit-down restaurants. (R. 65).

### B.   Determining Disability

The SSA has created the following five-step process to determine whether an individual is disabled and thus entitled to benefits under the Social Security Act:

| The 5-Step Test | | |
|---|---|---|
| Step 1 | Is the Claimant engaged in substantial gainful activity? | If yes, claim denied. If no, proceed to Step 2. |
| Step 2 | Does the Claimant suffer from a severe, medically-determinable impairment or combination of impairments? | If no, claim denied. If yes, proceed to Step 3. |
| Step 3 | Does the Step 2 impairment meet the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appx. 1? | If yes, claim granted. If no, proceed to Step 4. |
| *Determine Residual Functional Capacity* | | |
| Step 4 | Does the Claimant possess the residual functional capacity to perform the requirements of his past relevant work? | If yes, claim denied. If no, proceed to Step 5. |
| Step 5 | Is the Claimant able to do any other work considering his residual functional capacity, age, education, and work experience? | If yes, claim denied. If no, claim granted. |

*See* 20 C.F.R. §§ 404.1520(a), 404.1520(b) (Step 1); 20 C.F.R. § 404.1520(c) (Step 2); 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526 (Step 3); 20 C.F.R. § 404.1520(e-f) (Step 4); 20 C.F.R. § 404.1520(g) (Step 5).

As shown by the gray-shaded box, there is an intermediate step between Steps 3 and 4 that requires the ALJ to determine a claimant's "residual functional capacity," which is the claimant's ability to perform physical and mental work activities on a sustained basis.

### C.     Page's Application and the ALJ's Decision

The SSA reviews applications for benefits in three stages: (1) initial determination, including reconsideration; (2) review by an ALJ; and (3) review by the SSA Appeals Council. *See* 20 C.F.R. § 404.900(a)(1-4).

Page applied for disability insurance benefits and a period of disability in May 2017, claiming that she was unable to work because of various ailments, including fibromyalgia, arthritis, anxiety, and depression. After receiving an initial denial in August 2017, Page requested a hearing, which the ALJ conducted in April 2019. The ALJ ultimately issued an opinion denying Page's claims in June 2019.

At Step 1, the ALJ determined that Page was not engaged in substantial gainful activity and thus her claims would progress to Step 2.

At Step 2, the ALJ determined that Page suffered from the following severe impairments: fibromyalgia and anxiety and obsessive-compulsive disorders.

At Step 3, the ALJ found that none of Page's impairments, individually or combined, met or equaled the severity of any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1. So the ALJ next had to determine Page's residual functional capacity.

The ALJ determined that Page had the residual functional capacity to perform light work with these added limitations:

- Page can occasionally climb ramps or stairs.

- Page can never climb ladders, ropes, or scaffolds.

- Page can frequently balance.

- Page can occasionally stoop, kneel, crouch, or crawl.

- Page can frequently reach overhead bilaterally.

- Page can frequently handle or finger with the left upper extremity.

- Page can understand, remember, and carry out short, simple instructions with occasional interaction with supervisors and co-workers.

- Page cannot interact with the general public.

- Page can respond appropriately to changes in a routine work setting which are gradual and with an in-depth explanation.

- Normal work breaks can accommodate Page's time off task.

At Step 4, the ALJ found that Page could perform her past relevant work as an officer manager. Alternatively, the ALJ found that Page could perform other jobs, such as small product assembler, electrical accessory assembler, and inspector packer, that exist in significant numbers in the national economy. So the ALJ determined that Page was not disabled under the Social Security Act.

### D.   The Appeals Council's Decision

Page requested an Appeals Council review of the ALJ's decision. As part of her request for review, Page submitted a physical capacities form from Dr. Thompson and medical records from Lifestyle Medicine. Page also submitted a psychological evaluation and mental health source statement from Dr. June Nichols, a consultative examiner. The Appeals Council denied Page's request for review and refused to exhibit this evidence, finding that there was no "reasonable probability that it would change the outcome of the [ALJ's] decision." (R. 2).

## II.   STANDARD OF REVIEW

This court's role in reviewing claims brought under the Social Security Act is a narrow one. The scope of the court's review is limited to (a) whether the record contains substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and (b) whether the ALJ applied the correct legal standards, *see Stone v. Comm'r of Soc. Sec.*, 544 F. App'x 839, 841 (11th Cir. 2013) (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford*, 363 F.3d at 1158.

## III.   LEGAL ANALYSIS

Page makes five arguments for why the SSA erred in denying her request for benefits. First, Page argues that the ALJ needed to afford more weight to the opinions of Dr. Thompson, her treating physician. Second, Page asserts that the ALJ erred in finding that her daily activities undermined her subjective pain testimony. Third, Page contends that the ALJ improperly drew adverse inferences from a lack of medical treatment.

Page's final two arguments relate to the Appeals Council's decision and work together: (a) the Appeals Council erred when it refused to consider the evidence from Dr. Thompson and Dr. Nichols; and, (b) once this "new evidence" is considered alongside the evidence presented to the ALJ, the decision to deny benefits is not supported by substantial evidence. The court will first address, in turn, Page's arguments that the ALJ erred. The court will then address Page's Appeals Council arguments together.

### A.     Dr. Thompson's Opinion Evidence

Page first asserts that the ALJ had to afford the opinions of her treating physician, Dr. Thompson, substantial or considerable weight absent good cause to disregard his opinions. That's the rule that applies to claims filed before March 27, 2017. But Page filed for disability benefits in May 2017. And under the regulations that apply to claims filed on or after March 27, 2017, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)." *See* 20 CFR § 404.1520c(a).

1. <u>Applicable legal framework</u>: Page concedes that the new regulations no longer require an ALJ to defer to a treating physician's opinion. But she argues that these new regulations didn't abolish Eleventh Circuit precedent on the treating physician rule. As this court has recently explained, the Social Security Act allowed the Commissioner to implement regulations that did away with the treating physician rule. *See Douglas v. Saul*, 2021 WL 2188198, at *4 (N.D. Ala. May 28, 2021). In an unpublished opinion, the Eleventh Circuit has agreed that the "new regulatory scheme no longer requires the ALJ to either assign more weight to medical opinions from a claimant's treating source or explain why good cause exists to disregard the treating source's opinion." *Matos v. Comm'r of Soc. Sec.*, 2022 WL 97144, at *4 (11th Cir. Jan. 10, 2022). And Page doesn't assert that the 2017 regulations are arbitrary, capricious, or otherwise invalid. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 845 (1984) (courts must defer to validly adopted regulations). The court will thus apply the 2017 regulations—not the treating physician rule—to the ALJ's evaluation of Dr. Thompson's opinion evidence.

Under the new regulations, an ALJ should focus on the persuasiveness of an opinion by looking at the opinion's supportability and consistency. *See* 20 CFR § 404.1520c(b)(2). The ALJ may, but need not, explain how he considered other factors, such as the medical source's relationship with the claimant and specialization, when assessing a

medical opinion. *See id.* "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." 20 CFR § 404.1520c(c)(1). And "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 CFR § 404.1520c(c)(2).

 2. <u>Dr. Thompson's opinions</u>: Dr. Thompson is Page's internist. In June 2018, Dr. Thompson filled out a physical capacities form on behalf of Page.[1] According to Dr. Thompson, Page can sit upright in a standard chair for 0 minutes at a time. (R. 368). And Page can stand for less than 30 minutes at a time. (*Id.*). Dr. Thompson also expected Page to spend 2 hours in an 8-hour daytime period lying down, sleeping, or sitting with her legs propped at waist level or above. (*Id.*). Dr. Thompson also said that he expected Page to be off-task 50% of the time during an 8-hour day and that Page's physical symptoms would likely cause her to miss 7 days of work in a 30-day period. (*Id.*). Finally, Dr. Thompson asserted that Page's chronic back pain caused these limitations and that Page's medicine sometimes caused drowsiness. (*Id.*).

 The ALJ found Dr. Thompson's opinions unpersuasive "because the assessments are not supported by relevant objective medical evidence, inconsistent with evidence from other medical and nonmedical sources, and contradicted by other factors." (R. 33). As the ALJ noted, the only supportable explanation Dr. Thompson provided was that Page suffered from chronic back pain, and he didn't back this statement up by documenting significant positive objective findings. (*Id.*). The ALJ then recognized that Dr. Thompson treated Page "over a period of time" but

---

[1] Page only challenges the ALJ's handling of the opinions expressed in Dr. Thompson's physical capacities form. She doesn't challenge the ALJ's evaluation of a mental health source statement from Dr. Thompson. So Page has abandoned any challenge to the ALJ's handling of the mental source statement. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680–82 (11th Cir. 2014). In any event, the opinions expressed in Dr. Thompson's mental health source statement support the ALJ's finding that Page's mental impairments aren't disabling. (R. 387.) So any error in the ALJ's handling of the mental health source statement is harmless. *See Romero v. Comm'r of Soc. Sec.*, 752 F. App'x 906, 908 (11th Cir. 2018).

noted that "his treatment mostly consisted of medication refills." (R. 33–34). Finally, the ALJ found that the objective medical evidence, including Dr. Thompson's own treatment notes, contradicted Dr. Thompson's opinions. (R. 34).

The ALJ's analysis of Dr. Thompson's opinions shows that he applied the correct legal standard by evaluating the persuasiveness of Dr. Thompson's opinions based on the factors of supportability and consistency. And substantial evidence supports the ALJ's finding that Dr. Thompson's opinions weren't persuasive. As for supportability, the ALJ correctly noted that Dr. Thompson's only explanation for his recommended limitations was that Page suffered from chronic back pain and occasional drowsiness. (R. 33). And Dr. Thompson didn't point to any positive objective findings that would support these limitations. It was also reasonable for the ALJ to conclude that Dr. Thompson's treatment history with Page didn't support the limitations given because his treatment mainly consisted of medication refills. (*See* R. 388, 390, 416, 418, 420–21, 423–24, 425–26, 428, 430, 433, 435, 437–38, 440, 442).

As for consistency, the ALJ correctly noted that examination findings revealed normal range of motion in Page's extremities, good pedal pulses, active reflexes, intact pinprick sensation, and a normal gait. (*See* R. 34, 390, 437). And all Page's laboratory studies, except for her vitamin B12 limits, in January 2019 were normal. (R. 393). Plus, imaging studies showed only minimal findings of degenerative disc disease in Page's spine. (R. 410, 413). The ALJ also correctly noted that Page pursued a conservative course of treatment, consisting of narcotic pain and psychiatric medication, and there's no evidence that Dr. Thompson thought her physical conditions warranted more treatment. (*See* R. 388, 394, 416, 421, 423, 426, 428, 430, 433, 438, 445). Based on these treatment records, it was reasonable for the ALJ to conclude that the objective medical evidence contradicted Dr. Thompson's assessments.

Page's argument that the ALJ erred focuses on the length of her treating relationship with Dr. Thompson. But a medical source's

relationship with a claimant is only one of several factors that ALJs consider when evaluating a medical opinion. *See* 20 CFR § 404.1520c(c)(3). And though Page asserts that Dr. Thompson's clinical and laboratory findings support his opinions, it's not the court's job to "decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *See Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Having reviewed the evidence, the court finds that a reasonable person could conclude, as the ALJ did, that Dr. Thompson's opinions lacked supportability and conflicted with the other record evidence. So substantial evidence supports the ALJ's decision to find Dr. Thompson's opinions unpersuasive.

### B. Page's Daily Life Activities

Page next argues that the ALJ improperly found that evidence of her daily activities diminished the persuasiveness of her allegations. This argument fails for two reasons. First, Page doesn't explain how or why the ALJ erred in considering her daily activities. Instead, Page simply points out that the ALJ found her daily activities contradicted her subjective allegations and then block quotes cases that reversed credibility determinations based on the claimant's daily activities. By failing to elaborate on this argument, Page has abandoned it. *See Sapuppo*, 739 F.3d at 681–82.

Second, a claimant's admission that she participates in daily activities for short durations does not disqualify the claimant from disability, *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997), but it is appropriate for an ALJ to consider daily activities relevant to a claimant's subjective pain allegations. *See* 20 CFR § 404.1529(c)(3)(i). And this court "will not disturb a clearly articulated credibility finding supported by substantial evidence." *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014).

A reasonable person could agree that Page's daily activities discredited her subjective pain testimony. As recounted in the ALJ's hearing decision, Page testified at the ALJ hearing that she leads a

limited lifestyle because of her pain and anxiety. For example, she claimed that her fibromyalgia causes her to lie down several times a day. (R. 61). But in her function report, Page reported that she prepares simple meals and performs some household chores, such as light cleaning and laundry. (R. 230). Page also goes out alone shopping for groceries, visiting relatives, and attending some school events. (R. 231–32). And Page has engaged in some activities that require concentration, such as counting change, watching television, and reading daily. (*Id.*) These daily activities undermine Page's allegations about the severity of her symptoms. So the ALJ didn't err in pointing to these activities as one of several factors that supported his decision to discredit Page's testimony.

### C. Lack of Medical Treatment

Page also contends that the ALJ improperly drew adverse inferences from her lack of mental health treatment. In assessing a claimant's credibility, one factor an ALJ may consider is the level of treatment that the claimant sought. *See* SSR 16-3p, 2016 WL 1119029, at *7–8. But an ALJ "will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with his or her complaints." *Id.* at *8. And an inability to afford a prescribed treatment regimen will excuse noncompliance. *See Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988).

During the ALJ hearing, Page testified that she's on anxiety medication but that she hasn't gone to counseling or had inpatient care for mental health issues. (R. 58). And in his hearing decision, the ALJ noted that though the consultative psychological examiner diagnosed Page with generalized anxiety disorder, "she was not receiving any mental health treatment." (R. 32). But despite discussing Page's lack of mental health treatment, the ALJ didn't explicitly consider whether Page could afford to see a psychologist or another mental health professional.

Even though the ALJ didn't discuss whether Page could afford mental health treatment, Page hasn't established reversible error. That's

11

because the ALJ considered Page's lack of specialized treatment as only one of several factors that supported his disability determination. *See Beegle v. Soc. Sec. Admin., Comm'r*, 482 F. App'x 483, 487 (11th Cir. 2012) ("[R]eversible error does not appear where the ALJ primarily based [his] decision on factors other than non-compliance, and where the claimant's non-compliance was not a significant basis for the ALJ's denial of disability insurance benefits."). The ALJ also considered the consultative examiner's findings, Dr. Thompson's treatment records, the effectiveness of Page's medications, Page's mental status examination findings, and Page's daily activities. (R. 32–33). And these factors provide substantial evidence to support the ALJ's disability determination. So any error in failing to discuss Page's ability to afford mental health treatment was harmless. *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003).

### D. New Evidence to the Appeals Council

Page finally argues that the Appeals Council erred in denying her request for review and that the evidence submitted to the Appeals Council establishes that substantial evidence doesn't support the denial of benefits. The Appeals Council will review an ALJ's decision if it "receives additional evidence that is new, material, relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision." 20 CFR § 404.970(a)(5).

1. Background: Page submitted to the Appeals Council treatment records and a physical capacities form from Dr. Thompson and a psychological evaluation and mental health source statement from Dr. June Nichols, a consultative examiner, as "new evidence" to consider in the first instance. Dr. Thompson's treatment notes are from April and July 2019. The April 2019 treatment notes stated that Page suffers from episodes of chest pain, had control of her hypertension, suffers from chronic anxiety/depression, takes Norco for chronic back pain, and has acid reflux with evidence of gastritis. (R. 43). Dr. Thompson then said to schedule Page for a 3-month follow-up unless her EKG came back with

abnormal results. (*Id.*). That 3-month follow-up appointment occurred in July 2019. (R. 42). On physical examination, Dr. Thompson found that Page had a sad countenance and cried easily. (*Id.*). But Page's lungs were clear, her heart rate had a regular rhythm at 70 beats per minute, and she had no edema in her extremities. (*Id.*). So Dr. Thompson started Page on a trial with Effexor, scheduled Page for a sleep apnea study, and gave Page a prescription for narcotics. (*Id.*) Dr. Thompson then told Page to return in 3 months. (*Id.*).

During the July 2019 appointment, Dr. Thompson filled out another physical capacities form. (R. 21). This time, Dr. Thompson said Page could sit upright in a standard chair for an hour at a time. (*Id.*) He also stated that Page could stand for less than 30 minutes at a time. (*Id.*). Dr. Thompson then noted that he expected Page to spend 2 hours during an 8-hour daytime period lying down, sleeping, or sitting with legs propped at waist level or above. (*Id.*). Dr. Thompson also expected Page to (a) be off-task 50% of the time in an 8-hour day, and (b) to miss 4–5 days of work because of her symptoms. (*Id.*).

In September 2019, Dr. June Nichols conducted a psychological evaluation of Page. (R. 9–12). During her mental status exam, Page's stream of consciousness was clear and her thought processes were within normal limits. (R. 10). There was also no evidence of confusion, loose associations, tangentiality, flight of ideas, or thought blocking. (*Id.*). Page's conversation pace was also within normal limits. (*Id.*). And there was no evidence of auditory or visual hallucinations and delusions. (*Id.*). Though Page doesn't have ideas of reference, obsessions, or compulsions, Dr. Nichols found that Page does suffer from panic attacks. (*Id.*). But Page's judgment and insight were good, Page's speed of mental processing was adequate, Page's recent memory functions appeared grossly intact, and Page's general fund of knowledge was adequate. (R. 11).

After the consultative exam, Dr. Nichols wrote that Page can manage basic self-care and understand, carry out, and remember short, simple, and 1-to-2-step instructions. (*Id.*). But Dr. Nichols said Page

cannot maintain attention/concentration and pace for at least 2 hours or maintain a regular schedule with appropriate punctuality. (*Id.*). Dr. Nichols then stated that Page would miss more than 1 to 2 days per month because of mental health issues. (*Id.*). Dr. Nichols also found that Page cannot: (1) sustain an ordinary work routine without the need for special supervision, (2) seek and accept appropriate instructions and criticisms from supervisors, or (3) maintain socially appropriate appearance, behavior, and other aspects of social interaction in a workplace. (R. 11–12). Finally, Dr. Nichols stated that Page might could manage her finances reliably and independently but noted that Page's husband was managing all of their financial responsibilities. (R. 12).

A few weeks after the psychological evaluation, Dr. Nichols filled out a mental health source statement on Page's behalf. (R. 8). Most of Dr. Nichols' opinions tracked what she said in the psychological evaluation. For example, Dr. Nichols again stated that Page can understand, remember, or carry out very short and simple instructions. (*Id.*). But Dr. Nichols reiterated that Page cannot maintain attention, concentration, or pace for at least 2 hours. (*Id.*). Dr. Nichols also stated that she expected Page to be off-task 50% of the time during an 8-hour day. (*Id.*). Finally, Dr. Nichols explained that in a 30-day period she expected Page to miss 6 to 10 days of work because of her psychological symptoms. (*Id.*).

2. <u>Possibility v. Probability</u>: The Appeals Council didn't exhibit the new evidence from Dr. Thompson or Dr. Nichols, finding "this evidence does not show a reasonable probability that it would change the outcome of the decision." (R. 2). Page argues that the Appeals Council applied the wrong standard of review because she must only show that there's a reasonable ***possibility*** that the new evidence would change the administrative result. This argument fails for two reasons.

First, though the Eleventh Circuit has applied a reasonable possibility standard to determine whether new evidence is material, the SSA's current regulations state that the Appeals Council will grant a request for review based on additional evidence only if "there is a

14

reasonable probability that the additional evidence would change the outcome of the decision." 20 CFR § 404.970(a)(5). And the Appeals Council denied Page's request for review well after the SSA's current regulations—which use the word "probability"—took effect in May 2017. So the Appeals Council didn't err when it applied the reasonable probability standard to Page's new evidence. *See Clark v. Soc. Sec. Admin., Comm'r*, 848 F. App'x 858, 862 (11th Cir. 2021).

Second, the Eleventh Circuit has used the terms "reasonable possibility" and "reasonable probability" interchangeably when discussing the Appeals Council's evaluation of new evidence. *See, e.g.*, *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1321–22 (11th Cir. 2015). So the court finds there's no material difference between the two standards.

3. Waiver: As for the merits of the Appeals Council's determination, Page's three briefs on this topic all merely cite the legal standard for material evidence and then conclusorily state that the materials from Dr. Thompson and Dr. Nichols meet this legal standard. Page doesn't point to what portions of these treatment notes, examinations, or opinions she contends would have changed the ALJ's decision. Nor does she explain what portions of the ALJ's opinion would have been different had the ALJ considered the evidence submitted to the Appeals Council.

"[S]imply stating that an issue exists, without further argument or discussion, constitutes abandonment of that issue and precludes [this court from] considering the issue on appeal." *Singh v. U.S. Atty. Gen.*, 561 F.3d 1275, 1278–79 (11th Cir. 2009). And this court cannot—and will not—make Page's arguments for her. *See Sapuppo*, 739 F.3d at 681. Because Page hasn't explained why the materials from Drs. Thompson and Nichols would change the outcome of the ALJ's opinion, she has waived the argument that the Appeals Council erred in denying review.

4. Merits: Even if Page hadn't waived the argument, the court would still find that the evidence from Dr. Thompson and Dr. Nichols is immaterial. The treatment notes from Dr. Thompson include unremarkable examination findings and suggest that Page had a normal

EKG. (R. 42–43). These records also reflect that Dr. Thompson was continuing Page on a conservative course of treatment, with routine follow-up exams scheduled for three months after each appointment. (*Id.*). So Page hasn't shown that these treatment notes would tilt the weight of the evidence in her favor.

Page also hasn't shown that the new physical capacities form from Dr. Thompson was material. In fact, this physical capacities form included less extreme limitations than those listed in the form the ALJ considered. (*Compare* R. 368 *with* R. 21). For example, in the first physical capacities form, Dr. Thompson stated that Page can sit upright in a standard chair for 0 minutes at a time. (R. 368). But in the new physical capacities form, Dr. Thompson circled that Page can sit upright in a standard chair for an hour at a time. (R. 21). So the court highly doubts that this new physical capacities form would have changed the ALJ's opinion.

Nor has Page established that the materials from Dr. Nichols would have likely changed the outcome. Dr. Nichols' mental health source statement includes only conclusory answers to questions that "do not explain in any details the reasons for [the] opinions." *See Harrison v. Comm'r Soc. Sec.*, 569 F. App'x 874, 881 (11th Cir. 2014). Plus, the extreme limitations found in the psychological evaluation report and mental health source statement contradict Dr. Nichols' benign mental status exam findings discussed above. *See Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1310 (11th Cir. 2018) (finding physical capacities form that contradicted the doctor's own medical records and other objective evidence immaterial). In short, there's no reasonable possibility that the new evidence Page presented to the Appeals Council would have changed the ALJ's decision.

\* \* \*

To sum up, Page hasn't shown that the Appeals Council had to exhibit the new evidence she submitted to it. And because the Appeals Council didn't have to consider these medical records, the court needn't reach Page's argument that once this evidence is considered, the ALJ's decision lacks the support of substantial evidence.[2] *See id.*

## IV. CONCLUSION

The ALJ applied the correct legal standards and substantial evidence supports the ALJ's decision, and the Appeals Council did not err in denying Page's request for review. So the court will **AFFIRM** the SSA's denial of benefits. The court will enter a separate final order that closes this case.

**Done** on February 24, 2022.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE

---

[2] The court also doesn't need to consider this argument because it consists of a single conclusory sentence that fails to cite legal authorities or the record.